## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| US DATAWORKS, INC., | § | CASE NO. 17-32765 |
| | § | |
| DEBTOR. | § | (CHAPTER 11) |

**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 107(B), 361, 362, 363, 364 AND 507 (1) APPROVING POSTPETITION FINANCING, (2) AUTHORIZING USE OF CASH COLLATERAL, (3) GRANTING LIENS, (4) GRANTING ADEQUATE PROTECTION, (5) MODIFYING THE AUTOMATIC STAY, AND (6) SCHEDULING A FINAL HEARING**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED.  IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER.  IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

THE MOVANT REQUESTS CONSIDERATION OF THE MOTION AS SOON AS THE COURT'S CALENDAR WILL ALLOW AND IN ANY EVENT NO LATER THAN MAY 16, 2017.

3004004-1

TO THE HONORABLBE UNITED STATES BANKRUTPCY JUDGE:

US Dataworks, Inc. ("**Dataworks**" or the "**Debtor**") hereby submits its *Emergency Motion for Entry of Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 107(B), 361, 362, 363, 364, and 507 (1) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens, (4) Granting Adequate Protection, (5) Modifying the Automatic Stay, and (6) Scheduling a Final Hearing* (the "**Motion**").  In support of its Motion, the Debtor respectfully submits as follows:

## I.  INTRODUCTION

1.     Through the Motion, the Debtor seeks authority from the Bankruptcy Court to, among other things: (i) use the cash collateral of its secured creditor(s); (ii) enter into post-petition debtor-in-possession financing; and (iii) grant the proposed post-petition lender liens that would prime all pre-petition liens.  For the reasons set forth in detail below, the requested relief is both necessary and in the best interest of the Debtor's bankruptcy estate (the "**Estate**") and creditors as it will provide the necessary funding to allow the Debtor to successfully complete its chapter 11 case.

## II.  JURISDICTION, VENUE AND STATUTORY PREDICATE

2.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

3.     Venue of the Debtor's chapter 11 case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory predicate for the relief sought herein is sections 105, 361, 362, 363, and 364 of title 11, United States Code (the "**Bankruptcy Code**"), and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

2

### III. CORE PROCEEDING

5.    This is a core proceeding under 28 USC § 157(b).  Since this is a core proceeding, the Bankruptcy Court has constitutional authority to enter final orders regarding the Motion. Further, to the extent that the Bankruptcy Court determines that it does not have authority to enter a final judgment on a portion of or all of the Motion, the Debtor requests that the Bankruptcy Court issue a report and recommendation for a judgment to the United States District Court for the Southern District of Texas, Houston Division

### IV. PROCEDURAL BACKGROUND

6.    On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**"), thereby commencing the above-styled bankruptcy case (the "**Case**").

7.    The Debtor continues to operate its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The U.S. Trustee has not yet appointed any official committee in this Case (a "**Statutory Committee**"), and no request has been made for the appointment of a trustee or an examiner.

### V. COMPANY BACKGROUND

**A. THE COMPANY'S CORPORATE STRUCTURE**

8.    US Dataworks, Inc., is a Nevada C corporation, that develops, markets, and supports payment processing software for on-premise customers and on-demand cloud-computing service customers within multiple market segments.  Its customer base includes financial institutions as well as credit card companies, government institutions, banker's banks,

business process outsourcers, and high-volume merchants in the United States.  The Company is headquartered in Sugar Land, Texas.

9.      The Debtor's board of directors currently consists of two (2) directors – John Penrod and Joe Saporito.  Mr. Penrod is also the Debtor's CEO.  Mr. Saporito is the CAO for Rackspace Managed Hosting.  Mr. John Penrod has been with the Company since 2010 and also serves as its President.

**B.  THE COMPANY'S ORIGINS**

10.      The Company was originally incorporated under the laws of the state of Colorado as JLQ, Inc. in December of 1994.  In October of 1997, JLQ, Inc. changed its name to New World Publishing.  In May of 1999, New World Publishing acquired Communications Television, Inc., a California corporation, and changed the focus of its business to that of an internet marketing and technology infrastructure company, specializing in supporting cost effective business-to-business and business-to-consumer revenue based marketing initiatives.

11.      In October of 1999, New World Publishing changed its name to Sonicport.com, Inc. and in February of 2000, it re-incorporated under the laws of the state of Nevada.  In February of 2001, Sonicport.com changed its name to Sonicport, Inc.

12.      In April of 2001, Sonicport, Inc. acquired a Delaware corporation known as US Dataworks, Inc. ("**DWD**").  In conjunction with this acquisition, Sonicport, Inc. refocused its business and concentrated on developing electronic check processing software.

13.      In March of 2002, Sonicport, Inc. changed its name to US Dataworks, Inc. and in May of 2002, the Company merged DWD into Dataworks.

3004004-1

### C.  The Company's Equity Structure

14.     In July of 2013, Dataworks became a non-reporting public entity.   The Company's stock is publicly traded on the pink sheets under the ticker symbol "UDWK". Dataworks has one series of common stock issued and outstanding, designated as Common Stock, and one series of preferred stock issued and outstanding, designated Series B Convertible Preferred Stock.

15.     Based on information provided by the Company's transfer agent, American Stock Transfer & Trust Company ("**ASTTC**"), as of the December 31, 2016, there were 109,933 shares of Preferred Stock and 38,764,144 shares of Common Stock outstanding and entitled to vote.

| Share Type | # Share Holders Of Record | # Shares |
|---|---|---|
| Preferred | 5 | 109,933 |
| Common Stock | 216 | 38,764,144 |

The top thirty (30) shareholders hold slightly more than fifty percent (50%) of all outstanding shares and the top twenty (20 shareholders hold approximately thirty-seven percent (37%) of all outstanding shares.  The Company's stock has very low trading volumes and low stock prices.

### D.  Business Operations

#### i.   The Company's Products

16.     Dataworks has developed a software product called Clearingworks. Clearingworks was entirely developed and is entirely owned by the Company.   However, Clearingworks incorporates some external partner software to deliver certain specific functionality – primarily A2IA software for image analysis and data extraction.

17.     The Company's clients use Clearingworks to process incoming accounts receivable payments.  Clearingworks allows for the automation of receiving incoming payments,

creating deposit files, and posting them to the clients' A/R systems thereby reducing the difficulties and costs associated with payment processing. Clearingworks is a payment processing system with proven, enterprise-class payment, deposit, returns processing, and powerful payment analytic tools, which is currently delivered in two environments: (i) a Cloud delivery model and (ii) an on-premise installed solution.

18.     Clearingworks is an integrated, multi-channel payment platform designed to reduce operational costs by streamlining the payments from all channels into one fast and convenient platform. Payment channels include Web payments, telephone payments, mailed-in payments, and walk-in payments. Clearingworks quickly converts incoming payments into working capital by consolidating deposits into the lowest cost deposit channel. This includes routing to a specific banking relationship and converting check payments into fully electronic deposits. Clearingworks provides functionality and reduces the time spent processing returned items by automating both return matching and the processing of resubmissions and return fees. This improves the ability to collect returned items and the consistency of fee assessment. Clearingworks also provides reporting capabilities that (i) assist in tracking payment status, (ii) produce detailed analytic information, and (iii) offers the visibility to monitor payment progress across multiple payment channels.

*ii.   The Company's Customers and Strategic Business Relationships*

19.     The Company markets primarily to banks and business process outsourcers that look to provide the types of services that Clearingworks offers to their corporate clients. Dataworks has a small customer base (16 customers). However, that small customer base accounts for Dataworks processing payments for approximately four hundred (400) commercial entities.

6

20.     From time to time, the Company partners with various businesses in connection with its sales and marketing efforts, including entering into reseller agreements with certain value-added partners, which allows them to sell our Clearingworks solutions and other products and services.  Significant business partners include bankers' banks that provide Clearingworks to their customers, who are banks.

### iii.  Government Regulation Applicable to the Company's Business

21.     As a processor of Automated Clearing House ("**ACH**") payments, Dataworks must comply with federal laws governing the processing of electronic transactions.  The Company is in compliance with all such federal laws and works closely with NACHA, the association that manages the development, administration, and governance of the ACH Network, the backbone for the electronic movement of money and data, to ensure its systems remain compliant with all applicable laws and regulations, as well as NACHA guidelines.

### iv.  The Company's Employees

22.     As of December 31, 2016, Dataworks had twelve (12) full-time and one (1) part-time employees. The Company's employees provide expertise in programming, software development, modification and maintenance, system conversions, sales and marketing, account management, finance and administration, client services, and technical support.  As described above, the Company has already reduced headcount.  Thus, the remaining employees are essential to the Company's ability to continue operations.

23.     On October 8, 2015, Dataworks entered into a Workforce Optimization Client Service Agreement (the "**Workforce Agreement**") with Insperity PEO Services, L.P. ("**Insperity**").  Pursuant to the terms of the Workforce Agreement, Insperity became a co-employer of Dataworks employees and took on certain responsibilities with respect to the employees, including, but not limited to: (i) administering all payroll functions; (ii) maintaining

7

workers' compensation insurance; (iii) offering employees health and welfare benefits plans; (iv) maintaining employment practices liability insurance that also covered Dataworks; and (v) providing human resources services for Dataworks.  In exchange, Insperity charges Dataworks a service fee equivalent of 21.91% of its gross payroll for each pay period.  Maintaining this contract with Insperity is also vitally important to retaining the Company's employees, continuing operations without interruption, and a successful chapter 11 case.

### E.  DATAWORKS' ASSETS, LIABILITIES, AND FINANCIAL PERFORMANCE

#### i.  *Assets & Liabilities*

24.     US Dataworks primary assets are Clearingworks and the customer contracts that have been executed to license and support Clearingworks.  As explained above, the software source code has been developed entirely by Dataworks and is its intellectual property.  Dataworks currently has contracts with sixteen (16) customers that represent approximately $2,000,000.00 in annual revenues.   As of the Petition Date, the Debtor has approximately $2,675,986.08 in assets and approximately $3,689,654.38 and $296,341.65 in secured and unsecured debt, respectively.

#### ii.  *Financial Performance*

25.     For the fiscal year ending March 31, 2015, US Dataworks had $3.6 million in revenue, which resulted in EBITDA of approximately $906,000 and net income of approximately $566,000.

26.     For the fiscal year ending March 31, 2016, US Dataworks had $2.8 million in revenue, which resulted in EBITDA of approximately $276,000 and net income of approximately $181,500.

8

27.     For the fiscal year ending March 31, 2017, US Dataworks forecasts its revenue to be $2,073,501, with EBITDA of approximately $(153,690) and net income of approximately $(251,904).  The reduction in revenue from fiscal year 2016 to fiscal year 2017 is primarily attributable to the Company's largest customer (by volume) electing to end its maintenance contract.  Additionally, revenue targets and forecasts are somewhat variable as many of the Debtor's customer contracts are based on the number of transactions processed through the software.

## VI.  THE EVENTS PRECIPITAING THE CHAPTER 11 FILING

### A.  THE UNEXPECTED DEATH OF THE COMPANY'S CEO AND CHAIRMAN

28.     Beginning in the early 2000's, the company was led by Chuck Ramey, who served as both CEO and Chairman.  As far back as fiscal year ending March 31, 2009 and continuing through fiscal year ending March 31, 2014, the Company operated at a net loss, with losses ranging from approximately $600,000.00 to as much as $1,300,000.00 per fiscal year.  Mr. Ramey utilized his own resources to cover the Company's operating losses – either by making loans to the Company or through un-reimbursed expense submissions.  Unfortunately, Mr. Ramey passed away unexpectedly in March of 2014.  Immediately after Mr. Ramey passed away, Mr. Penrod took over as the as CEO for the Company.

### B.  EFFORTS UNDERTAKEN TO ELIMINATE THE COMPANY'S OPERATING LOSSES

29.     For the fiscal year ending March 31, 2014, the Company posted $3,500,000.00 in gross revenues, $1,300,000.00 in losses, and actual cash losses of approximately $250,000.00.  Knowing that these continued operating losses were unsustainable, especially without Mr. Ramey to serve as a backstop, the Company immediately undertook steps to reduce its expenses.

The Company, among other things, reduced headcount, sub-let a portion of its office space, and worked to restructure its outstanding debt.

30.     As a result of negotiations with the Prepetition Unperfected Secured Creditors, the Company eliminated more than $1,000,000.00 in debt and accrued interest, extended the maturity dates of its debt, and lowered the interest rates on its debt from more than ten percent (10%), in some instances, to rates below six percent (6%).  In exchange, the Company agreed to make monthly interest payments of approximately $11,000.00 and to pay certain "restructuring fees".  The Company's current balance on these obligations is approximately $2,900,000.00.

31.     For the fiscal year ending March 31, 2015, the Company showed signs of improvement by generating $3,600,00.00 in gross revenues, $906,000.00 in EBITDA, and $566,000.00 in net income.  However, the Company experienced a setback for fiscal year ending March 31, 2016, generating $2,800,00.00 in gross revenues, $276,000.00 in EBITDA, and $181,000.00 in net income (before Goodwill impairment).

32.     In addition to these expense reduction measures, the Company also seriously pursued strategies to raise capital and/or sell the Company.  However, the Company's attempts to raise capital were not successful for a variety of reasons, but primarily because, the Company (i) is a small public entity, (ii) has high debt, and (iii) lacks sales traction (*i.e.*, the Company had not been adding new accounts).  Likewise, to that point, no one had expressed interest in purchasing the Company.

33.     The Company's financial situation was further complicated in October of 2015, when its historically largest client (by revenue) decided to exercise its option to discontinue the Company's maintenance and support services.  This event resulted in a reduction of the Company's monthly revenues by approximately $100,000.00.

3004004-1

34.     While the loss in revenue presented significant challenges, the Company's management believed that the lost revenue could be overcome with the addition of new clients, which was anticipated to occur reasonable quickly.  Moreover, it was anticipated that by adding these new clients, the Company would only experience a small and "manageable" short-fall in revenues and that any such small short-fall could be overcome by raising capital.  Unfortunately, several of the anticipated new clients delayed the roll-out of their use of Clearingworks and/or the execution of their contracts by several months, which further complicated issues.

### C.  THE COMPANY'S CONTEMPLATION OF A CHAPTER 11 BANKRUPTCY CASE

35.     Despite the Company's best efforts, it had been unable to overcome the impact of lost revenue, which when combined with impending debt maturity put the Company at risk of becoming insolvent and being forced to cease operations.  In January of 2016, faced with the possibility of insolvency and the cessation of all operations, the Company began investigating the possibility of using a chapter 11 bankruptcy case in order to restructure its balance sheet and/or sell the Company.  In April of 2016, the Company ceased servicing its debt.

36.     At the same time, approximately fifty (50) potential investors and/or buyers were approached about the possibility of investing in and/or purchasing the Company through a chapter 11 proceeding or otherwise.  In April of 2016, the Company had an initial call with one of its largest customers, The Bankers Bank ("**TBB**").  TBB expressed interest in purchasing Dataworks' operations through a chapter 11 bankruptcy case.  Since that initial expression of interest, the Company and TBB (the "**Parties**") have worked to reach an agreement with respect to such a sale.

37.     Also in the spring of 2016, the Company engaged bankruptcy counsel to provide guidance and counsel regarding, among other things: (i) a potential bankruptcy filing; (ii) the

potential sale of its assets to TBB through the bankruptcy process; and (iii) its efforts to negotiate an asset purchase agreement.  In October of 2016, TBB tendered a letter of intent outlining the structure and terms of their intended offer.  In late November of 2016, the terms of a formal asset purchase agreement were completed and it was executed.

### D.  THE COMPANY'S NEED FOR CAPITAL PRIOR TO ITS BANKRUPTCY FILING

38.     In the period leading up to the filing of its chapter 11 bankruptcy petition, the Company found itself facing a liquidity crisis.  Faced with shortfalls in cash flow and some unexpected expenses, the Company turned to TBB to provide financing to pay off the Company's burdensome factoring arrangement and fund its operations through the chapter 11 process.

39.     As explained above, TBB agreed to extend a loan to the Company for the operating capital needed to ensure that the Company's operations were not interrupted in the weeks leading up to its chapter 11 filing.  Prior to the Petition Date, TBB agreed to advance up to $550,000.00 of the face value of the TBB Note with the understanding that the Company would seek authority from the Bankruptcy Court to obtain debtor-in-possession ("**DIP**") financing with respect to any further advances by TBB, which would be secured by post-petition priority priming liens against all of the Debtor's property.

### E.  THE COMPANY'S NEED FOR CAPITAL DURING THE PENDENCY OF THE CASE

40.     Without the prospect of DIP financing and the interim relief sought by the Debtor, there would undoubtedly be a complete stoppage of support for existing contracts and an inability to complete current projects, a prospect that the Debtor and the Estate simply cannot withstand.  Moreover, such a result would likely decimate the Debtor's going concern value and eliminate any chance of a successful chapter 11 case.

3004004-1

41.     Dataworks believes that the proposed financing and other relief sought today will enable the Debtor and its stakeholders to implement an orderly reorganization through its chapter 11 bankruptcy case.  The proposed financing will also allow the Debtor to meet some of its immediate cash needs for operations generally as well as provide funding to keep current projects alive thereby preserving its going concern value for the benefit of its Estate.

42.     In sum, the Debtor sought chapter 11 protection in order to protect and preserve its assets and ongoing operations, and to allow it to bring in additional cash through post-petition financing in order to continue operations and affect an orderly restructuring.  The Debtor has determined in the prudent exercise of its business judgment that the commencement of the chapter 11 case and the proposed DIP financing is the best alternative to ensure that maximum value can be preserved and realized for the benefit of its Estate constituents.

## VII.  PRE-PETITION DEBT STRUCTURE

### A.  THE SUBORDINATED DEBT

*i.  The Carlson Debt*

43.     On or about June 25, 2015, the Debtor and Ivan and Jackie Carlson (collectively, "**Carlson**") entered into that certain Note and Warrant Amendment and Reinvestment Agreement (the "**2015 Carlson Agreement**").  The 2015 Carlson Agreement amended those certain 12% Senior Subordinated Convertible Notes issued in favor of Carlson on or about August 4, 2011 in the amount of $100,000.00 (the "**2011 Carlson Note**"), as subsequently amended and supplemented, and on or about August 7, 2012 in the amount of $50,000.00 (the "**2012 Carlson Note**" and together with the 2011 Carlson Note, the "**Carlson Notes**"), as subsequently amended and supplemented.  The 2015 Carlson Agreement, among other things, extended the maturity dates and reduced the interest rates of the Carlson Notes.

13

44.     The Carlson Notes granted Carlson a security interest (the "**Carlson Security Interest**") in most, if not all, of the Debtor's assets to guarantee the payment of the Carlson Notes.  However, the 2011 Carlson Notes states that such security interest is subject to certain subordination agreements.  Likewise, the 2012 Carlson Note also states that the Carlson Security Interest is subject to certain subordination agreements.

45.     On or about October 27, 2011, that certain UCC Financing Statement (Document Number 2011028610-0) (the "**Senior Subordinated Financing Statement**") was filed with the Nevada Secretary of State evidencing the security interests of the "Holders of those Certain US Datworks, (*sic*) Inc. 12% Senior Subordinated Notes Due August 1, 2012" (the "**Secured Parties**").  The Senior Subordinated Financing Statement purports to cover virtually all, if not all, of the Debtor's assets.  However, the Senior Subordinated Financing Statement lapsed in the fall of 2016 and has not been renewed.  Thus, the Carlson Security Interest is an unperfected security interest; to the extent it was ever perfected.  As of the Petition Date, the outstanding balance due and owing to Carlson was approximately $157,000.00 (the "**Carlson Debt**").

*ii.  The Reck Debt*

46.     On or about July 17, 2015, the Debtor and Richard A. Reck ("**Reck**") entered into that certain Note and Warrant Amendment and Reinvestment Agreement (the "**2015 Reck Agreement**").  The 2015 Reck Agreement amended that certain 12% Senior Subordinated Convertible Note issued in favor of Reck on or about August 20, 2012 in the amount of $50,000.00 (the "**2012 Reck Note**"), thereby, among other things, extending its maturity date and reducing the interest rate.

47.     The 2012 Reck Note granted Reck a security interest (the "**Reck Security Interest**") in virtually, if not all, of the Debtor's assets to guarantee the payment of the 2012

14

Reck Note.  However, the 2012 Reck Note states that such security interest is subject to certain subordination agreements.

48.     On or about October 27, 2011, the Senior Subordinated Financing Statement was filed with the Nevada Secretary of State evidencing the security interests of the Secured Parties. The Senior Subordinated Financing Statement purports to cover virtually all, if not all, of the Debtor's assets.  However, the Senior Subordinated Financing Statement lapsed in the fall of 2016 and has not been renewed.  Thus, the Reck Security Interest is now an unperfected security interest; to the extent it was ever perfected.  As of the Petition Date, the outstanding balance due and owing to Reck was approximately $52,333.36 (the "**Reck Debt**").

   *iii. The Nicholson Debt*

49.     On or about March 26, 2015, the Debtor and John L. Nicholson, M.D. ("**Nicholson**"), a former director of the Debtor, entered into that certain Note Modification Agreement (the "**2015 Nicholson Agreement**").  The 2015 Nicholson Agreement amended that certain Refinancing Secured Note issued in favor of Nicholson on or about August 13, 2008 in the principal amount of $2,995,000.00, as subsequently amended and/or modified (the "**2008 Nicholson Refinancing Note**"), by, among other things, extending the maturity date, reducing the principal balance in exchange for the issuance of stock, reducing the interest rate of the note, and reducing the accrued interest balance.

50.     The 2008 Nicholson Refinancing Note in conjunction with that certain note purchase agreement and security agreement both dated August 11, 2008, granted Nicholson a security interest (the "**Nicholson Security Interest**") as to all assets of the Debtor in order to guarantee the payment of the 2008 Nicholson Refinancing Note.  However, the 2015 Nicholson Agreement expressly acknowledges and reaffirms the agreements to subordinate the Debtor's

obligations to Nicholson to certain of the Debtor's other obligations, including, but not limited to, the Debtor's obligations to Carlson, Kimberly R. Rice, and Reck.

51.     On or about October 27, 2011, the Senior Subordinated Financing Statement was filed with the Nevada Secretary of State evidencing the security interests of the Secured Parties. The Senior Subordinated Financing Statement purports to cover virtually all, if not all, of the Debtor's assets.  However, the Senior Subordinated Financing Statement lapsed in the fall of 2016 and has not been renewed.  Thus, the Nicholson Security Interest is an unperfected security interest; to the extent it was ever perfected.  As of the Petition Date, the outstanding balance due and owing to Nicholson was approximately $2,057,000.00 (the "**Nicholson Debt**").

### iv.  The Ramey Debt

52.     On or about July 16, 2015, the Debtor and Frances F. Ramey, as successor in interest to Charles E. Ramey, a former director of the Debtor (collectively, "**Ramey**" and together with Carlson, Reck, and Nicholson, the "**Prepetition Unperfected Secured Creditors**"), entered into that certain Note Modification Agreement (the "**2015 Ramey Agreement**").  The 2015 Ramey Agreement amended that certain Refinancing Secured Note issued in favor of Ramey on or about August 13, 2008 in the principal amount of $708,500.00, as subsequently amended and/or modified (the "2008 Ramey Refinancing Note"), by, among other things, extending the maturity date, reducing the principal balance in exchange for the issuance of stock, reducing the interest rate of the note, and reducing the accrued interest balance.

53.     The 2008 Ramey Refinancing Note in conjunction with that certain note purchase agreement, granted Nicholson a security interest (the "**Ramey Security Interest**") as to certain of the Debtor's assets in order to guarantee the payment of the 2008 Ramey Refinancing Note. However, the 2015 Ramey Agreement expressly acknowledges and reaffirms the agreements to subordinate the Debtor's obligations to Ramey to certain of the Debtor's other obligations.

54.     On or about October 27, 2011, the Senior Subordinated Financing Statement was filed with the Nevada Secretary of State evidencing the security interests of the "Holders of those Certain US Datworks, (*sic*) Inc. 12% Senior Subordinated Notes Due August 1, 2012".  The Senior Subordinated Financing Statement purports to cover virtually all, if not all, of the Debtor's assets.  However, the Senior Subordinated Financing Statement lapsed in the fall of 2016 and has not been renewed.  Thus, the Ramey Security Interest is an unperfected security interest; to the extent it was ever perfected.  As of the Petition Date, the outstanding balance due and owing to Ramey was approximately $795,200.00 (the "**Ramey Debt**" and together with the Carlson Debt, Reck Debt, and Nicholson Debt, the "**Subordinated Debt**").

## B.  THE TBB NOTE

55.     On January 26, 2017, the Company and TBB entered into a first lien Promissory Note ("the **TBB Note**") and security agreement (the "**TBB Security Agreement**"), pursuant to which TBB agreed to advance Dataworks up to $550,000.00 to be utilized for working capital.  The TBB Note's maturity date is July 31, 2017 and bears interest at a rate of six percent (6%) per annum.

56.     In order to secure the TBB Note, the Company granted TBB a security interest in and liens on all of its assets.  In conjunction with the Company granting the TBB Note and TBB Security Agreement, each of the Prepetition Unperfected Secured Creditors executed a debt subordination agreement (the "**TBB Subordination Agreements**") thereby agreeing to subordinate the Company's obligations to them to those owed to TBB.  Accordingly, TBB maintains a first lien priority (the "**TBB Prepetition Liens**") position with respect to all of the Company's assets.

57.     In late November of 2016, Dataworks and TBB entered into an asset purchase agreement, which contemplated the purchase of Dataworks' assets by TBB free and clear in the context of a chapter 11 bankruptcy case to be filed by Dataworks.  In order to facilitate Dataworks' ability to maintain business operations during the period leading up to the filing of its chapter 11 bankruptcy case (*i.e.,* prior to the Petition Date), TBB advanced  $549,743.38 to the Company under the terms of the TBB Note.  As of the Petition Date, the outstanding balance of the TBB Note was $549,743.38 (the "**Perfected Secured Obligations**") plus accrued interest.

## VIII.  SUMMARY OF THE REQUESTED RELIEF

58.     Through the Motion, the Debtor seeks the entry of an order, substantially in the form of order attached hereto as **Exhibit "A"** (the "**Interim Order**"), authorizing the Debtor to, among other things: (a) enter into a secured debtor-in-possession term loan facility (the "**DIP Facility**") in an aggregate principal amount of up to  $150,000.00 upon the terms and conditions substantially similar to the TBB Note attached as Exhibit 1 to the Interim Order (collectively, the "**DIP Term Sheet**," and, collectively with such final documentation, as may be amended, supplemented, restated, or otherwise modified from time to time (the "**DIP Documents**"); (b) authorizing the Debtor to execute and deliver the DIP Documents by and among the Debtor and TBB (the "**DIP Lender**"), and to perform such other acts as may be necessary or desirable in connection with the DIP Documents; (c) granting the DIP Facility and all obligations owing thereunder and under the DIP Documents to the DIP Lender in and on the terms provided in the DIP Term Sheet (collectively, the "**DIP Obligations**"), including allowed secured lien status in the above-styled chapter 11 bankruptcy case (the "**Case**") and any successor cases; (d) granting to the DIP Lender automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "**Cash**

18

**Collateral**," as defined in section 363(a) of the Bankruptcy Code; (e) authorizing the use of the Cash Collateral of TBB and the Prepetition Unperfected Secured Creditors, to the extent the Prepetition Unperfected Secured Creditors hold liens on the Debtor's cash, and providing adequate protection to TBB as necessary; and (f) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents.  The Debtor also requests that the Court schedule a hearing to consider approval of the DIP Credit Agreement on a final basis (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**").  **NOTE:** The final DIP Documents are not yet finalized but will be in substantially the same form and under the terms of the DIP Term Sheet attached to the Interim Order.

## IX.  <u>PRELIMINARY STATEMENT</u>

59.     Due to the Company's decreased revenues, debt load, lack of new customers, and inability to raise capital as described above and as outlined in the *Declaration of John Penrod in Support of First Day Motion(s)* attached hereto as **Exhibit "B"**, the Debtor finds itself with over $3,985,996.03 of indebtedness and less than $35,000.00 in cash as of the Petition Date. However, the path to considerable, short-term improvement is clear, as prior to the Petition Date, the Debtor entered into an asset purchase agreement with TBB, who agreed to provide Dataworks the liquidity necessary to prepare and file the Case and has also agreed to provide the debtor-in-possession financing necessary to effectuate the proposed sale.  The proceeds from such a sale will be utilized to implement and fund a chapter 11 plan of liquidation.  The DIP Facility should permit the Debtor to complete the sale of its assets and provide a sound basis for the confirmation of its chapter 11 plan.

60.     As explained above, the Debtor has obtained a commitment for a fully underwritten $150,000.00 debtor-in-possession financing facility (the "**DIP Facility**") from TBB, who is to serve as the DIP Lender and which also, intends to purchase the Debtor's assets.

61.     As outlined in the *Declaration of John Penrod in Support of First Day Motions*, the Debtor engaged in an arm's-length process in securing this financing.  In the course of this process, modifications were made to the terms of the DIP Facility, at the Debtor's request and to its benefit.  In connection with the DIP Facility and the TBB Note, the Debtor also reached certain agreement(s) with the Prepetition Unperfected Secured Creditors, who each agreed to subordinate their claims to those of TBB (*i.e.*, the TBB Subordination Agreements).

62.     The DIP Facility commitment received by the Debtor constitutes an important endorsement of the Debtor and its plan to implement it chapter 11 plan of liquidation.  The facility provides for a fully underwritten  $150,000.00 new money term loan to be advanced on a secured basis and to be secured by a first priority priming lien against the Debtor's property and assets.  The DIP Facility will allow the Debtor to undertake and complete certain urgent projects that are critical to its efforts in this Case and will provide the Debtor with adequate liquidity through its reorganization process.   The Debtor seeks immediate authority to borrow up to $150,000.00 under the DIP Facility on an interim basis pursuant to the Interim Order.

63.     The Debtor further seeks immediate authority to use the Cash Collateral of TBB and the Prepetition Unperfected Secured Creditors, to the extent the Prepetition Unperfected Secured Creditors have liens on the Debtor's cash.  TBB and each of the Prepetition Unperfected Secured Creditors have consented to the DIP Facility and the Debtor's continued use of Cash Collateral on the terms set forth herein and in the DIP Orders.

64.     As described above, the Perfected Secured Obligations as secured by security interests in (*i.e.*, the TBB Security Agreement) and liens (*i.e*., the TBB Prepetition Liens) on all assets of the Debtor including, without limitation all present and future rights of Dataworks in personal property and all proceeds and products from the personal property; including goods, chattel paper, deposit accounts, letter of credit rights, commercial tort claims, securities and all other investment property, and all products and proceeds of any of the foregoing (collectively, the "**Prepetition Collateral**"). The TBB Prepetition Liens have priority over any and all other liens on the Prepetition Collateral.

65.     Immediate access to the DIP Facility will enable the Debtor to continue to operate its business in the ordinary course during this chapter 11 case, maintain customer, vendor, and supplier relationships, maintain its insurance program, pay its employees and satisfy other working capital and operational needs.  Importantly, it will also permit the Debtor to preserve the going concern value of its key assets pending a sale of the same.  Obtaining the funds needed to continue, uninterrupted, the work it is contractually required to undertake on behalf of its customers is necessary and essential to preserving the going-concern value of the Debtor's business enterprise and ultimately effectuate a successful chapter 11 case.  Moreover, the Debtor does not believe that unsecured financing is available or feasible under the circumstances or that any other party would be wiling to provide financing to the Debtor absent priming liens against the Prepetition Collateral.  Accordingly, the Debtor submits that the DIP Facility should be approved.

## X.  RELIEF REQUESTED

66.     The Debtor respectfully requests that the Court grant the following relief as provided in the DIP Orders:

(a)  **The DIP Facility**: Authority to enter into the DIP Facility, and execute and deliver definitive documentation with respect thereto (*i.e.*, the DIP Documents) consistent with the DIP Term Sheet in an aggregate principal amount of up to $150,000.00, which shall provide liquidity to fund the Debtor's continuing operations, subject to certain conditions, upon entry of the Interim Order;

(b)  **DIP Liens**: Granting the DIP Lender, effective immediately upon entry of the Interim Order, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (the "**DIP Liens**") all now owned or hereafter acquired tangible and intangible property of the Debtor and the Estate, including, without limitation, all inventory, accounts receivable, general intangibles, chattel paper, owned real estate, real and personal property leaseholds, fixtures and machinery and equipment, deposit accounts, Cash Collateral, letter of credit rights, patents, copyrights, trademarks, tradenames, rights under license agreements, other intellectual property, capital stock of direct subsidiaries of the Debtor (collectively, the "**DIP Collateral**" and, together with the Prepetition Collateral, the "**Collateral**").  The DIP Liens shall be senior in priority and superior to any security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral, subject only to the Carve-Out, as defined below. Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be secured by perfected first priority, senior priming liens on the DIP Collateral that secures the Perfected Secured Obligations and Prepetition Unperfected Secured Obligations (collectively, the "**Primed Liens**"), which senior priming liens in favor shall also

22

prime any liens granted after the Petition Date to provide adequate protection in respect of any of the Primed Liens;

(c) **Adequate Protection:** Granting TBB, with respect to all outstanding Perfected Secured Obligations, continuing valid, binding, enforceable and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (the "**TBB Adequate Protection Liens**"), pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code,, which lines shall be junior only to (i) the Carve-Out (as defined below) and (ii) the DIP Liens, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral as adequate protection solely to the extent of any diminution in the value, if any, of its interests in the Prepetition Collateral;

(d) **Cash Collateral**:   Authorizing use of the Cash Collateral of TBB and the Unperfected Secured Parties, to the extent the Unperfected Secured Parties have liens on the Debtor's cash, under the terms of the applicable agreement, financing statement, orders, and budget approved by the DIP lender (the "**Budget**").  A copy of the Budget is attached hereto as **Exhibit "C"**;

(e) **Automatic Stay**:  Vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order; and

(f) **Final Hearing**:  Scheduling a date for a hearing on this Motion to consider entry of the Final Order no later than the 30th day following the entry of the Interim Order.

## XI.  SUMMARY OF KEY PROVISIONS

67.     The following is a summary of the key provision of the about the relief requested

herein:[1]

| MATERIAL TERMS OF THE DIP FACILITY[2] | |
|---|---|
| **Borrower** | US Dataworks, Inc. |
| **DIP Lender** | The Bankers Bank<br>9020 N. May Ave, Ste. 200<br>Oklahoma City, OK  73120 |
| **Use of Proceeds** | The proceeds of the DIP Facility shall generally be used (a) to finance working capital needs and general corporate purposes of the Debtor, all in accordance with the applicable Budget, subject to certain conditions and expenditure variances and (b) to pay the fees, costs and expenses incurred by the Debtor in connection with the Case. |
| **New Money Facility** | The New Money Facility is a $150,000.00 term loan facility. |
| **Final Maturity** | DIP Facility will mature on the earliest of (i) July 31, 2017 or (ii) the closing of a sale of substantially all of the Debtor's assets. |
| **Interest Rate** | The interest rate under the DIP Facility will be 6.00% per annum. |
| **Security and Priority** | All DIP Obligations shall be entitled, subject to the Carveout (as defined below) to the following claims and liens as follows:<br><br>(i)     pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be secured by a perfected first priority lien on all DIP Collateral that is not subject to valid, perfected, and non-avoidable liens in existence as of the Petition Date or to valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code; and |

---

[1]  This statement is a summary of certain terms and conditions set forth in the TBB Note, the DIP Term Sheet and the DIP Orders.  To the extent this statement is inconsistent with the DIP Term Sheet and/or the DIP Orders, the DIP Documents and the DIP Orders shall control.

[2]  Capitalized terms used in Section X of the Motion but not defined therein shall have the meanings assigned to such terms in the DIP Documents.

| MATERIAL TERMS OF THE DIP FACILITY[2] | |
|---|---|
| | (ii) pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Liens shall be secured by a perfected first priority, senior priming lien on the DIP Collateral that secures the Perfected Secured Obligations and the Subordinated Debt (collectively, the "**Primed Liens**"), which senior priming liens in favor shall also prime any liens granted after the Petition Date to provide adequate protection in respect of any of the Primed Liens. |
| **Carve-Out** | "**Carve-Out**" shall mean (i) all fees required to be paid pursuant to 28 U.S.C. § 1930 and (ii) in the event of the occurrence and during the continuance of an Event of Default, the payment of allowed and unpaid professional fees and disbursements (collectively, "**Professional Fees**") incurred by the Debtor and any Statutory Committee (other than any such fees and disbursements incurred in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the lender under the DIP Facility). The Carve-Out shall not exceed $100,000 unless the DIP Lender consents in writing to an increased amount. |
| **Availability** | **Conditions to Initial Availability**.  Usual conditions for debtor-in-possession facilities and transactions of this type and others to be reasonably specified by the DIP Lender, including, without limitation: <br><br>(a) commencement of the Case and entry of "first day orders" satisfactory to the DIP Lender; <br><br>(b) receipt of the Budget and such other information as may be reasonably requested by the DIP Lender; <br><br>(c) entry of the Interim Order within ten (10) business days following the Petition Date; <br><br>(d) compliance by the Debtor in all respects with the Interim Order; <br><br>(e) delivery of satisfactory corporate documents; <br><br>(f) evidence of authority; <br><br>(g) absence of material adverse change other than by virtue of the commencement of the Case; <br><br>(h) accuracy of representations and warranties; and <br><br>(i) absence of defaults. <br><br>Subject to satisfaction of the foregoing, and as set forth in greater detail in the DIP Term Sheet up to  $150,000.00 shall be available for uses consistent with and in accordance with the Budget. |

3004004-1

| | |
|---|---|
| MATERIAL TERMS OF THE DIP FACILITY[2] | |
| | **Conditions to Subsequent Availability**. Usual conditions for debtor-in-possession facilities of this type and others to be reasonably specified by the DIP Lender, including, without limitation:<br><br>(j)   entry of the Final Order in substantially the form of the Interim Order, with only such modifications thereto as are satisfactory in form and substance to the DIP Lender in its sole and absolute discretion, no later than thirty-five (35) days following the date of entry of the Interim Order, which Final Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed;<br><br>(k)   compliance by the Debtor in all respects with the Interim Order and Final Order;<br><br>(l)   compliance with the Budget and applicable availability limitations specified above under the caption "Availability" in the DIP Term Sheet;<br><br>(m)   accuracy of representations and warranties; and<br><br>(n)   absence of defaults.<br><br>Subject to satisfaction of the foregoing $150,000.00 shall be available under the New Money Facility for uses consistent with and in accordance with the Budget. |
| **Covenants** | **Affirmative Covenants**. Usual for debtor-in-possession facilities and transactions of this type and others to be reasonably specified by the DIP Lender (to be applicable to the Borrower), including, without limitation, maintenance of corporate existence and rights; performance of obligations; delivery of updates to the Budget, and weekly compliance with the Budget (subject to weekly expenditure variances on a line item and aggregate (for such week) basis, with no individual line item variance exceeding 20% and aggregate (for such week) variance not exceeding 10%), including maintenance of accounts payable in compliance with the Budget; other customary debtor in-possession financing reporting requirements (it being understood and agreed by the DIP Lender that an advisory firm may assist the Debtor in reviewing accounting matters; analyzing, reviewing and confirming the Debtor's cash flow and capital expenditure budget; and monitoring budget variances and other similar matters in connection with such reporting); delivery of notices of default, litigation, ERISA events and material adverse change; maintenance of customer contracts and relationships; maintenance of satisfactory insurance; compliance with laws; inspection |

| MATERIAL TERMS OF THE DIP FACILITY[2] |
|---|

|  | of books and properties; further assurances; and compliance by the Debtor in all respects with the Interim Order and Final Order.<br><br>**Negative Covenants**.   Usual for debtor-in-possession facilities and transactions of this type and others to be reasonably specified by the DIP Lender (to be applicable to the Debtor), including, without limitation: limitations on dividends on, and redemptions, and repurchases of, equity interests and other restricted payments; limitations on prepayments, redemptions, and repurchases of debt (other than loans under the New Money Facility) and prohibition on prepaying prepetition debt; limitations on liens and sale-leaseback transactions; limitations on loans and investments; limitations on debt, guarantees, and hedging arrangements; limitations on mergers, and acquisitions, limitations on transactions with affiliates; limitations on changes in business conducted by the Debtor and its subsidiaries and limitations on creation and formation of new subsidiaries; limitations and restrictions on the ability of subsidiaries to pay dividends or make distributions; limitations on amendments of debt and other material agreements; limitations on capital expenditures. |
|---|---|
| **<u>Events of Default</u>** | Usual for debtor-in-possession facilities and transactions of this type and others to be reasonably specified by the DIP Lender relating to the Debtor (subject, where appropriate, to thresholds and grace periods to be agreed upon), including, without limitation:<br><br>(a)   dismissal of the Case or conversion of the Case to a chapter 7 case;<br><br>(b)   appointment of a chapter 11 trustee, a responsible officer or an examiner with enlarged powers (beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of the Debtor in the Case;<br><br>(c)   the granting of any superpriority claim or lien which is *pari passu* with or senior to the claims or liens of the DIP lender in the Case;<br><br>(d)   the commencement by the Debtor of actions adverse to the DIP Lender or its rights and remedies under the DIP Facility in the Case;<br><br>(e)   failure of the Final Order to be entered within thirty-five (35) days after entry of the Interim Order;<br><br>(f)   failure of the Interim Order or Final Order to be in full force and effect, including by the entry of an order reversing, amending, supplementing, staying for a period in excess of fourteen (14) days, vacating or otherwise modifying, in a |

27

| MATERIAL TERMS OF THE DIP FACILITY[2] | |
|---|---|
| | manner that is adverse to the DIP Lender, the Interim Order, or the Final Order; |
| | (g) failure of the Debtor to comply with the terms of the Interim Order or Final Order; |
| | (h) entry of an order by the Bankruptcy Court terminating the use of cash collateral; |
| | (i) the payment by the Debtor (by way of adequate protection or otherwise) of any principal or interest or other amount on account of any pre-petition indebtedness or payables (other than certain exceptions to be agreed upon); |
| | (j) the entry of an order or orders granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party or third parties to proceed against any assets of the Debtor or to permit other actions that would have a material adverse effect on the Debtor or the Estate; |
| | (k) the rendering of any postpetition judgment(s) or order(s), against the Debtor, the enforcement of which is not stayed or the rendering of any non-monetary judgment against the Debtor which causes or would reasonably be expected to cause a material adverse effect; |
| | (l) the filing of a Plan of Reorganization that does not provide for the indefeasible payment in full upon confirmation in cash of all obligations owed to the DIP Lender; |
| | (m) failure on or before 180 days after the commencement of the Case, to obtain an order of the Bankruptcy Court approving a sale of the assets of the Debtor; |
| | (n) termination of the Debtor's exclusivity period; |
| | (o) cessation of work otherwise contemplated by the Budget adversely affecting material current or planned business operations; |
| | (p) violation of covenants; |
| | (q) incorrectness of representations and warranties in any material respect; and |
| | (r) the filing of any application or pleading by the Debtor seeking, or otherwise consenting to, any matters set forth above that would constitute an Event of Default. |
| **Remedies Upon an Event of Default** | Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Lender, may declare (i) all DIP Obligations |

28

| MATERIAL TERMS OF THE DIP FACILITY[2] |
|---|
| owing under the DIP Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtor to the extent any such commitment remains, (iii) the termination of any DIP Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations; and/or (iv) the termination, reduction, or restriction on the ability of the Debtor to use any Cash Collateral, except for the payment of any portion of the Carve-Out (any such declaration, shall be referred to herein as a "**DIP Termination Declaration**").  The DIP Termination Declaration shall be given by facsimile (or other electronic means) to counsel to the Debtor, counsel to the Statutory Committee, if any, and the U.S. Trustee (and the earliest date any such DIP Termination Declaration is made shall be referred to herein as the "**DIP Termination Declaration Date**").  Any automatic stay otherwise applicable to the DIP Lender will be modified so that five (5) days after the DIP Termination Declaration Date (the "**DIP Remedies Notice Period**"), the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Documents and the Interim Order and shall be permitted to satisfy all DIP Obligations, subject to the Carve-Out.  During the DIP Remedies Notice Period, the Debtor and/or the Statutory Committee, if any, shall be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred.  Unless the Court determines that an Event of Default has not occurred, the automatic stay, as to the DIP Lender, shall automatically be terminated at the end of the DIP Remedies Notice Period without further notice or order.  Upon the expiration of the DIP Remedies Notice Period, the DIP Lender shall be permitted to exercise all remedies set forth herein, in the DIP Documents, and as otherwise available at law without any further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest or any other rights and remedies granted to the DIP Lender pursuant to the DIP Documents, the Interim Order, or the Final Order. |
| **Automatic Stay** | The Interim Order and the Final Order shall provide for the automatic lifting of the automatic stay to allow the DIP Lender to exercise, upon the occurrence of an Event of Default and five (5) business days' prior written notice, all rights and remedies under the DIP Documents, including, among other things, the right of the DIP Lender to accelerate amounts owed under the DIP Facility and to terminate the Debtor's use of Cash Collateral.  The emergency hearing during such five (5) business day period shall be limited in scope to determining whether an event of default has occurred. |

..

## XII.  **KEY PROVISIONS**

68.     As a condition to obtaining the proposed financing, the DIP Lender has required and the Debtor has agreed to certain provisions that may be considered key provisions.  In order to highlight these key provisions to the Court, they have been described below:

(g) **Carve-Out.**   The Carve-Out shall include (i) statutory fees payable to the U.S. Trustee or fees payable to the clerk of the Court pursuant to 28 U.S.C. § 1930; (ii) all allowed and unpaid professional fees (the "**Allowed Professional Fees**") incurred by the Debtor and any Statutory Committee, if any, for any professionals retained by the Debtor and/or any Statutory Committee under sections 327 or 1103(a) of the Bankruptcy Code (the "**Case Professionals**") pursuant to the Court's order (which order has not been vacated, stayed, or appealed) following the occurrence of a DIP Termination Declaration Date (the "**Carve-Out Amount**") and (ii) to the extent set forth in the Budget in effect prior to the DIP Termination Declaration Date, all Case Professionals' Fees incurred by the Debtor or the Statutory Committee for any Case Professionals on or prior to a DIP Termination Declaration Date.  The Carve-Out shall not exceed $100,000 unless the DIP Lender consents in writing to an increased amount.  So long as a DIP Termination Declaration Date has not occurred, the Debtor shall be permitted to pay Allowed Professional Fees, as the same may be due and payable under sections 330 and 331 of the Bankruptcy Code and in accordance with the Budget and the same shall not reduce the Carve-Out.   Any payment or reimbursement made on or after the occurrence of a DIP Termination Declaration Date in respect of any Allowed Professional Fees (exclusive of the application of any retainers by any of the Professionals) shall permanently reduce the Carve-Out

30

Amount on a dollar-for-dollar basis.  Any funding of the Carve-Out shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under the Interim Order, the Final Order, the DIP Documents, the Bankruptcy Code, and applicable law.

(h) **No Direct Obligation to Pay Professional Fees.**  The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Case or any successor cases under any chapter of the Bankruptcy Code.  Nothing in the Interim Order or otherwise shall be construed (i) to obligate the DIP Lender in any way to pay compensation to or to reimburse expenses of any Case Professional, (ii) to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement, (iii) as consent to the allowance of any professional fees or expenses of any Case Professionals, or (iv) to affect the right of the DIP Lender to object to the allowance and payment of such fees and expenses.

(i) **Certain Termination Events** (*Plan or Sale Process*).  It shall constitute a default in the event of the failure by the Debtor on or before 180 days after the commencement of the Case, to obtain an order of the Bankruptcy Court approving a sale of the assets of the Debtor.

## XIII.  BASIS FOR RELIEF

**A. THE DEBTOR SHOULD BE AUTHORIZED TO OBTAIN POSTPETITION FINANCING THROUGH THE DIP DOCUMENTS.**

  i. *Entry into the DIP Facility is an Exercise of the Debtor's Sound and Reasonable Business Judgment.*

69.       Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under the circumstances specified therein.  Provided that an agreement to

obtain secured credit does not undermine the policies underlying the Bankruptcy Code, courts grant a debtor considerable deference in the exercise of its sound business judgment in obtaining such credit.  *See, e.g.*, *In re Barbara K Enters., Inc*., Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party-in-interest"); *In re Ames Dep't Stores, Inc*., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc*., 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

    *ii.  The DIP Facility Represents the Best Available Financing.*

    70.    The proposed DIP Facility provides the Debtor and the Estate the most favorable financing under the circumstances confronting the Debtor.  As explained above, the Debtor does not believe that unsecured financing is available or feasible under the circumstances or that any other party would be willing to provide financing to the Debtor absent priming liens against the Prepetition Collateral.  Moreover, the Debtor's decision to enter into the DIP Facility was the result of an intensive effort by the Debtor to obtain the best terms available.  Indeed, as a fully underwritten facility providing new money in the aggregate amount of a $150,000.00, the DIP Facility will provide the Debtor with the significant additional liquidity that it needs.

71.     For these reasons, the Debtor submits that entry into the DIP Facility is in the best interests of the Debtor's creditors, is necessary to preserve the value of Estate assets, and is an exercise of the Debtor's sound and reasonable business judgment.

*iii. The Debtor Should be Authorized to Obtain Postpetition Financing on a Secured Basis.*

72.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both.  Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

73.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Reading Tube Indus.*, 72 B.R. 329 (Bankr. E.D. Pa. 1987).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *In re Snowshoe Co.*, 789 F.2d at 1088; *see also Pearl-Phil GMT (Far East) Ltd v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the

necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*; *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

74.     The Debtor attempted to secure financing on terms other than a secured basis, but given the Debtor's operational challenges and its over-leveraged balance sheet, it was unable to do so.  The Court should therefore authorize the Debtor to provide the DIP Lender secured status for any obligations arising under the DIP Facility as provided for in section 364(c)(2) of the Bankruptcy Code.

*iv.  The Debtor Should Be Authorized to Obtain Postpetition Financing Secured, in Part, by First Priority Priming Liens.*

75.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).

76.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets.  Courts consider a number of factors, including, without limitation:

(i)     whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

(ii)    whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtor's business;

(iii)   whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

(iv)    whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649, at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (16th ed. rev. 2012).  The DIP Documents satisfy each of these factors.

77.     First, as described above, the Debtor explored a variety of possible financing sources, and ultimately determined that the DIP Lender offered the best option for obtaining the postpetition financing the Debtor requires.  The Debtor and DIP Lender negotiated the DIP Documents in good faith and at arm's-length, and the DIP Documents reflect the most favorable terms on which the DIP Lender was willing to offer financing.  Adequate DIP financing structured so as to minimize execution risk was not available on other terms.

78.     Second, the Debtor needs the funds to be provided under the DIP Facility to preserve and enhance the value of the Estate for the benefit of all creditors and other parties in interest.  As explained above, absent the DIP Facility and use of the Cash Collateral, the Debtor will be unable to operate its business or prosecute the Case.  Providing the Debtor with the

liquidity necessary to preserve the value of the Estate's assets through the pendency of the Case is in the best interest of all stakeholders.

79.     Third, upon entry of the Interim Order, the DIP Facility will provide access to approximately a  $150,000.00 in liquidity, which the Debtor has determined is sufficient and, as discussed in greater detail below, necessary to allow the Debtor to maintain its operations and its relationships with key constituents notwithstanding the commencement of the Case, which are critical to the Debtor's short term ability to preserve Estate assets, and to its long term ability to successfully complete its chapter 11 case.   Accordingly, the terms of the DIP Facility are reasonable and adequate to support the Debtor's operations and restructuring activities through the pendency of the Case.

   v.   *The Interests of the Prepetition Secured Parties (both Perfected and Unperfected) Are Adequately Protected.*

80.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case . . . ."); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citations omitted)).

36

81.     First, the proposed sale of the Debtor's assets for $1,790,000.00 far exceeds the amount of the proposed DIP Facility and the Perfected Secured Obligations combined.  Thus, a sizable (approximately $1,574,743.37), cash cushion exists with respect to the prepetition advances TBB extended under the terms of the TBB Note and TBB Security Agreement. Moreover, each of the Unperfected Prepetition Secured Parties entered into a subordination agreement with respect to the full face value of the TBB Note and have therefore consented to priming liens being granted to TBB.  Finally, both TBB and each of the Unperfected Prepetition Secured Parties has consented to the use of cash collateral.

82.     Additionally, to account for any potential diminution in value, the Debtor will provide additional adequate protection to TBB, to which it has consented or is deemed to have consented, in the form of adequate protection liens.  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, with respect to the Perfected Secured Obligations, as adequate protection against any diminution in value the value of TBB's interests in the Prepetition Collateral, the Debtor shall grant to TBB, continuing valid, binding, enforceable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral, subordinate only to the Carve-Out.

**B.  THE DEBTOR SHOULD BE AUTHORIZED TO USE CASH COLLATERAL.**

83.     Section 363(c)(2) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral. Specifically, that provision provides, in pertinent part, as follows:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

84.     Further, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

85.     The Debtor has satisfied the requirements of both subsections (c)(2) and (e) of section 363 of the Bankruptcy Code, and should be authorized to use the Cash Collateral.  First, both TBB and the Prepetition Unperfected Secured Parties have consented (or are deemed to have consented) to the use of the Cash Collateral.  Second, TBB's interests in the Cash Collateral are adequately protected in satisfaction of section 363(e) of the Bankruptcy Code.  As described above, the amount of the proposed sale is well in excess of the outstanding indebtedness to TBB and the Debtor is providing replacement liens on the DIP Collateral and the Prepetition Collateral, including Cash Collateral, which adequately protects TBB's interests in the Prepetition Collateral from diminution caused by the DIP Facility.  Moreover, all of the parties have consented to the use of Cash Collateral.  Accordingly, the Court should authorize the Debtor to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### C.  THE DIP LENDER SHOULD BE DEEMED A GOOD FAITH LENDER UNDER SECTION 364(e).

86.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides as follows:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the

> pendency of the appeal, unless such authorization and the incurring of
> such debt, or the granting of such priority or lien, were stayed pending
> appeal.

11 U.S.C. § 364(e).

87.     As explained in detail herein and in the *Declaration of John Penrod in Support of First Day Motions*, the DIP Documents are the result of the Debtor's reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's length, good faith negotiations between and among the Debtor, and the DIP Lender.  The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

### D.  MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED.

88.     The DIP Documents and the proposed Interim Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be modified, upon the occurrence and during the continuation of any Event of Default (as such term is defined in the Interim Order), so that (i) the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Documents and the Interim Order and shall be permitted to satisfy all DIP Obligations, subject only to the Carve-Out.  The Interim Order provides, however, that the DIP Lender must provide the Debtor with five (5) days' prior written notice before exercising any enforcement rights or remedies, which will entitle the Debtor and the Statutory Committee,

39

if any, to seek an emergency hearing with the Court for the sole purpose of contesting whether, in fact, an Event of Default has occurred and is continuing.

89.     Stay modification provisions of this sort are ordinary features of postpetition financing arrangements, and, in the Debtor's business judgment, are reasonable under the circumstances. *See, e.g.*, *In re MPF Holdings US LLC*, Case No. 08-36084 (Bankr. S.D. Tex. Feb. 18, 2009) (final order modifying automatic stay); *see also In re United Retail Grp., Inc*., Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 22, 2012); *In re Sbarro, Inc*., Case No. 11-11527 (Bankr. S.D.N.Y. May 4, 2011); *In re MSR Resort Golf Course LLC*, Case No. 11-10372 (Bankr. S.D.N.Y. Jan. 25, 2012).

## E.  THE DEBTOR REQUIRES IMMEDIATE ACCESS TO THE CASH COLLATERAL AND DIP FACILITY.

90.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores*, 115 B.R. at 36.

91.     The Debtor and its Estate will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtor to borrow up to $150,000.00 under the DIP Facility is not granted promptly after the Petition Date.  *See* the *Declaration of John Penrod in Support of First Day Motion(s)* at ¶ 50 et. seq.  The Debtor has insufficient cash to fund operations without immediate use of Cash Collateral and access to the DIP Facility. Further, the Debtor anticipates that the commencement of the Case will significantly and immediately increase the demands on its free cash as a result of, among other things, the costs of

administering the Case, addressing key constituents' concerns regarding the Debtor's financial health and ability to continue operations in light of the Case, and making the payments authorized by other orders entered granting the Debtor's "first day" motions.

92.    Failure to obtain immediate access to these funds would likely cause the Debtor's operations to cease.  Any material cessation of the Debtor's operations would be devastating to the Debtor's otherwise favorable prospects for reorganization.  Accordingly, the Debtor has an immediate need for access to the DIP Facility on an interim basis to, among other things, continue the operation of its business, maintain its relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers, and otherwise satisfy its working capital and operational needs, all of which is required to preserve and maintain the Debtor's enterprise value for the benefit of all parties-in-interest.

93.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this and other districts in similar circumstances. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, Case No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis); *In re MPF Holding US LLC*, Case No. 08-36084 (Bankr. S.D. Tex. Feb. 3, 2009) (same); *see also In re United Retail Grp., Inc*., Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 2, 2012) (order approving postpetition financing on an interim basis); *In re Sbarro, Inc*., Case No. 11-11527 (Bankr. S.D.N.Y. Apr. 5, 2011) (same).  Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtor and the Estate and is consistent with, and warranted under, subsections (b)(2) and (c)(2) of Bankruptcy Rule 4001.

**F.  THE DEBTOR REQUESTS A FINAL HEARING.**

94.     Pursuant to subsections (b)(2) and (c)(2) of Bankruptcy Rule 4001, the Debtor requests that the Court set a date that is no longer than thirty (30) days from the entry of the Interim Order for a final hearing for consideration of entry of the Final Order.

95.     The Debtor requests that it be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the notice parties listed below.  The Debtor further requests that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## XIV.  REQUEST FOR WAIVER OF STAY

96.     The Debtor further seeks a waiver of any stay of the effectiveness of the order approving this motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."   As set forth above, the DIP Facility is essential to prevent irreparable damage to the Debtor's operations, value, and ability to reorganize.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the fourteen-day (14) stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## XV.  NOTICE

97.     Notice of this Motion has been provided by overnight delivery and electronic mail or facsimile to: (a)TBB; (b) the Prepetition Unperfected Secured Creditors; (c) Larry Ball, as counsel to certain DIP Lender; (d) the 20 largest unsecured creditors of the Debtor; (e) the United States Trustee's Office; (f) the Securities and Exchange Commission; and (g) the Internal

Revenue Service.  The Debtor believes that the notice provided is fair and adequate and that no further notice is necessary.

## XVI.  NO PRIOR REQUEST

98.     No prior request for the relief sought in this Motion has been made to this or any other court.

## XVII.  CONCLUSION

99.     For the reasons set forth above, the Debtor respectfully requests (i) the entry of an interim order substantially similar to the Interim Order attached as Exhibit A, (ii) that a final hearing on this Motion be set; and (iii) that the Court grant the Debtor all further and other relief, both at law and in equity, to which it may justly be entitled.

Dated:  May 9, 2017

Respectfully submitted,

HUGHESWATTERSASKANASE, LLP

By: */s/  Wayne Kitchens*
    Wayne Kitchens       TBN: 11541110
    wkitchens@hwa.com
    Steven Shurn          TBN: 24013507
    sshurn@hwa.com
    Simon Mayer          TBN: 24060243
    smayer@hwa.com
    Total Plaza
    1201 Louisiana Street, 28th Floor
    Houston, Texas  77002
    Telephone: (713) –759-0818
    Facsimile: (713) -759-6834

**PROPOSED ATTORNEYS FOR THE
DEBTOR AND DEBTOR-IN-POSSESSION**

## <u>CERTIFICATE OF SERVICE</u>

    The undersigned hereby certifies that, on this the 9th day of May, 2017, a true and correct copy of the *Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 107(B), 361, 362, 363, 364 and 507 (1) Approving PostPetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens, (4) Granting Adequate Protection, (5) Modifying the Automatic Stay, and (6) Scheduling a Final Hearing* was served via overnight delivery, facsimile and/or email, on the parties set forth on the attached service list.

                               */s/ Wayne Kitchens*
                                 Wayne Kitchens